```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
G&A STRATEGIC INVESTMENTS I LLC,      :
et al.,                               :
                                      :
        Plaintiffs,                   :
                                      :        23-cv-10766 (JSR)
            -v-                       :
                                      :
PETRÓLEOS DE VENEZUELA, S.A.          :
et al.,                               :
                                      :
        Defendants.                   :
------------------------------------x
GIRARD STREET INVESTMENT              :
HOLDINGS LLC,                         :
                                      :
        Plaintiff,                    :
                                      :        23-cv-10772 (JSR)
            -v-                       :
                                      :
PETRÓLEOS DE VENEZUELA, S.A.          :
et al.,                               :
                                      :
        Defendants.                   :
------------------------------------x
GIRARD STREET INVESTMENT              :
HOLDINGS LLC,                         :
                                      :
        Plaintiff,                    :
                                      :        24-cv-04448 (JSR)
            -v-                       :
                                      :
PDV Holding, Inc.                     :
                                      :
                                      :
        Defendant.                    :
------------------------------------x
```

OPINION & ORDER

JED S. RAKOFF, U.S.D.J.

Plaintiffs G&A Strategic Investments I LLC, G&A Strategic Investments II LLC, G&A Strategic Investments III LLC, G&A Strategic Investments IV LLC, G&A Strategic Investments V LLC, G&A Strategic Investments VI LLC, and G&A Strategic Investments VII LLC (collectively, "G&A"), and Girard Street Investment Holdings LLC ("Girard Street") move for summary judgment against Defendants Petróleos de Venezuela, S.A. ("PDVSA"), PDVSA Petróleo, S.A. ("PPSA"), and PDV Holding, Inc. ("PDVH") in the above-captioned consolidated cases. Plaintiffs seek summary judgment on Counts I and II holding PDVSA and PPSA jointly and severally liable for certain promissory notes acquired by plaintiffs, and on Count III holding PDVH liable for the putative judgment against PDVSA on the ground that it is an alter ego of PDVSA. PDVSA and PDVH oppose this motion, with PPSA joining as to Counts I and II only. PDVSA and PDVH cross-move for summary judgment on Counts III and IV.

This is not the only litigation involving PDVSA and its assets. Of particular importance is the extensive and long-running Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela, No. 1:17-mc-151 (D. Del.) ("Crystallex"), matter pending in the District of Delaware, where the court found PDVSA to be the alter ego of the Bolivarian Republic of Venezuela ("Venezuela") and authorized the attachment and judicial sale of PDVH shares to satisfy more than $20 billion of outstanding judgments. Unable to recover in the Crystallex process, plaintiffs here attempt to make

an end run around those proceedings by arguing that an alter ego relationship exists between PDVSA and PDVH, its American subsidiary. But neither law nor equity support plaintiffs' maneuvers. To begin with, plaintiffs fail to make the requisite legal showing that PDVSA exerted significant and repeated control over PDVH's day-to-day operations, which is required to overcome the strong presumption of corporate separateness. And as a matter of equity, plaintiffs' veil-piercing arguments also fail because there is no inequity that can be addressed here that could not have already been addressed in the Crystallex proceeding, a remedy of which plaintiffs did not avail themselves due to their own lack of diligence. For these and other reasons set forth below, the Court issued a "bottom-line" Order dated May 20, 2025, granting, inter alia, summary judgment in favor of defendants on plaintiffs' alter ego claims. This Opinion & Order states the reasons for that Order and directs entry of final judgment.

## I.  Background

Before turning to the merits, the Court sets forth the following pertinent and largely undisputed background facts.

### A. The Notes

PDVSA is a Venezuelan state-owned oil company established in 1975 following the nationalization of Venezuela's oil industry. PDVSA was created to coordinate, monitor, and control the state's

oil and gas operations. Dkt. 204 ("Defs.' Response to Pls.' 56.1") ¶ 6. PDVSA is an agency or instrumentality of Venezuela under 28 U.S.C. § 1603(b), the Foreign Sovereign Immunities Act ("FSIA"). Id. ¶ 9. Despite Venezuela's immense hydrocarbon wealth, PDVSA's financial condition had deteriorated sharply by the mid-2010s as the result of, inter alia, a combination of falling global prices of oil and reduced export volumes. Dkt. 203 ("Pls.' Response to Defs.' 56.1") ¶ 41; Defs.' Response to Pls.' 56.1 ¶ 222. By 2016, PDVSA had accumulated over $1 billion in outstanding commercial debt. Defs.' Response to Pls.' 56.1 ¶ 64.[1]

In an effort to restructure its growing financial obligations, PDVSA issued more than $1 billion in promissory notes governed by New York law — including the notes at issue in this case — to refinance arrears owed for services rendered to PDVSA. Id. ¶¶ 64, 302-303.

---

[1] Defendants dispute a simple graph offered by plaintiffs charting "oil basket prices and oil exports" over time as "lack[ing] foundation because there is no source, author, date, sponsor, information indicating how it was prepared" and other objections under Fed. R. Evid. 1006. See Defs.' Response to Pls.' 56.1 ¶ 221. This is a closer issue than defendants suggest, because the Court, in ruling on defendants' motion for summary judgement, may consider summary evidence and the like that Venezuela was in substantial economic difficulties by 2016 that purport to be authentic and that are either admissible or appear to summarize statistical evidence that could be presented in admissible form at trial. See Santos v. Murdock, 243 F.3d 681, 683 (2d Cir. 2001) (per curiam). But in any case, this dispute is irrelevant because neither side disputes that PDVSA was in significant financial straits.

The 2016 Halliburton Note: On June 29, 2016, PDVSA entered into a note agreement governed by New York law ("Haliburton Note Agreement") with Servicios Halliburton de Venezuela, S.A. ("Halliburton"), under which PDVSA issued — and PPSA guaranteed — a promissory note in the principal amount of $200,000,123.50. Defs.' Response to Pls.' 56.1 ¶¶ 44, 77. The note matured on June 29, 2019, and bore a simple annual interest rate of 6.5% ("2016 Halliburton Note"). Pls.' Response to Defs.' 56.1 ¶¶ 168, 170, 173; Defs.' Response to Pls.' 56.1 ¶ 44. Under the 2016 Halliburton Note, PDVSA was required to make quarterly interest-only payments for one year beginning on September 29, 2016, followed by quarterly payments of both interest and principal through maturity. Defs.' Response to Pls.' 56.1 ¶¶ 77-79. PDVSA made the first five interest-only payments and the first principal payment. Defs.' Response to Pls.' 56.1 ¶ 140. On January 8, 2017, however, Haliburton sent PDVSA a notice of default due to PDVSA's failure to meet its payment obligations. Neither PDVSA nor PPSA has since cured the default. Defs.' Response to Pls.' 56.1 ¶ 141-42.

On January 14, 2021, as authorized pursuant to a license obtained from the U.S. Department of the Treasury's Office of Foreign Asset Control ("OFAC"), Girard Street paid $13,051,000 to acquire the 2016 Halliburton Note from Halliburton, which then assigned the note to Girard Street on the same day. Defs.' Response to Pls.' 56.1 ¶¶ 119-26.

The 2017 Schlumberger Notes: On May 4, 2017, PDVSA entered into a series of note agreements ("Schlumberger Note Agreement," and collectively with the Halliburton Note Agreement, the "Note Agreements"), also governed by New York law, with Schlumberger Venezuela, S.A. ("Schlumberger"), another Venezuelan oil field services provider, under which PDVSA issued — and PPSA guaranteed — fourteen promissory notes with an aggregate principal amount of $700,000,007.14. These notes matured on May 4, 2020, and also bore a 6.5% annual interest rate (collectively, the "2017 Schlumberger Notes," and together with the 2016 Halliburton Note, the "Notes"). Pls.' Response to Defs.' 56.1 ¶¶ 207–211. On July 20, 2017, Schlumberger assigned the 2017 Schlumberger Notes to an affiliated entity, Schlumberger Finance B.V. ("SFBV"). Defs.' Response to Pls.' 56.1 ¶ 102. The first payment under the 2017 Notes was due on August 4, 2017 (for interest only) and August 4, 2018 (for interest and principal). Id. ¶ 89. PDVSA made only one of the twelve required interest payments and no principal payments. Id. ¶ 138.

On December 14, 2017, Schlumberger sent PDVSA a written notice of default, but neither PDVSA nor PPSA made any further payments. Defs.' Response to Pls.' 56.1 ¶¶ 129, 161. On October 29, 2018, G&A paid $121,625,001.24 to acquire the notes from SFVB through an intermediary, Cowen and Company, LLC ("Cowen"), which assigned the notes to G&A on the same day. Id. ¶¶ 106–10. On the same day, Cowen

emailed PDVSA and Schlumberger notifying them of the assignment from SFBV to Cowen. Id.

Each Note Agreement contains a guarantee clause, set forth in Article VI, Section 6.03, under which PPSA "absolutely, irrevocably and unconditionally" guarantees PDVSA's payment obligations "as primary obligor and not merely as surety." Defs.' Response to Pls.' 56.1 ¶¶ 83, 94; Pls.' Ex. 16 at 71-73; Pls.' Ex. 17 at 943-45. Under the terms of each Note Agreement, PPSA also expressly waived "any defense based on or arising out of any defense of the Issuer or the Guarantor or the unenforceability of all or any part of the Guaranteed Obligations . . . ." Defs.' Response to Pls.' 56.1 ¶¶ 83, 96. Like PDVSA, PPSA has failed to make payment on the Notes.

B. The Parties

Plaintiffs Girard Street and G&A are affiliates of Gramercy Funds Management, LLC ("Gramercy"), a Delaware-based investment firm specializing in distressed sovereign debt. Defs.' Response to Pls.' 56.1 ¶¶ 1-5. Plaintiffs brought these consolidated cases in light of PDVSA's continuing insolvency and now seek to recover nearly $1 billion in principal, interest, and pre-judgment interest by holding PDVH liable under an alter ego theory.

PDVH is a Delaware holding company formed in 1997 and wholly owned by PDVSA. Pls.' Response to Defs.' 56.1 ¶¶ 27, 29, 30-31. PDVH owns 100% interest in Citgo Holding, Inc. ("Citgo Holding"),

which, in turn, owns 100% of Citgo Petroleum Corporation ("Citgo"), a major U.S. oil refiner. Defs.' Response to Pls.' 56.1 ¶ 15. In addition to Citgo Holding, PDVH has several other wholly-owned U.S. subsidiaries — including Citgo Aruba Holding, LLC ("Citgo Aruba"), PDV Chalmette, LLC ("PDV Chalmette"), and LDC International Supply, LLC ("LDC"). Id. ¶¶ 19-22.

PDVSA, the ultimate parent of PDVH, is, as noted, a Venezuelan state-owned oil company, with a principal place of business in Caracas, Venezuela. Defs.' Response to Pls.' 56.1 ¶ 6. Article 303 of the Venezuelan Constitution states that Venezuela owns PDVSA "[f]or reasons of economic and political sovereignty and national strategy." Id. ¶ 8. In the Crystallex litigation, the Third Circuit has repeatedly held that PDVSA was an alter ego of Venezuela both during the Maduro regime and after the 2018 elections when the United States recognized the Interim Government and 2015 National Assembly as the legitimate, democratically elected government of Venezuela. Id. ¶ 11; see Crystallex Int'l Corp. v. Bolivarian Republic of Venezuela, 333 F. Supp. 3d 380, 406 (D. Del. 2018) ("Crystallex I"), aff'd, 932 F.3d 126 (3d Cir. 2019) )("Crystallex II") and OI Eur. Grp. B.V. v. Bolivarian Republic of Venezuela, 663 F. Supp. 3d 406 (D. Del. 2023), aff'd, 73 F.4th 157 (3d Cir. 2023) ("OEIG"), cert. denied, 144 S. Ct. 549 (2024).

C. Political Strife in Venezuela

The events giving rise to the Note transactions occurred against the backdrop of increasing political instability in Venezuela following the death of former President and long-time leader, Hugo Chávez. In April 2013, Nicolás Maduro was elected President to complete Chávez's term. Defs.' Response to Pls.' 56.1 ¶¶ 192-93. After Maduro's election, PDVSA disclosed that as the "sole owner" of PDVSA, Venezuela "has pursued, and may pursue in the future, certain macroeconomic and social objectives," and acknowledged that as a result PDVSA "may engage in activities that give preference to the objectives of the Venezuelan government rather than [PDVSA's] economic and business objectives. Id. ¶ 197.

"In 2016, the President of Venezuela was Nicolás Maduro, but the country's legislature, the National Assembly [i.e., the legislative branch of the Venezuelan government], was controlled by a coalition of opposition parties. This lineup led to tension surrounding Maduro's and the National Assembly's respective constitutional powers." Petróleos De Venezuela S.A. v. MUFG Union Bank, N.A., 106 F.4th 263, 265-66 (2d Cir. 2024).[2] After the 2018 election, Maduro claimed victory over the opponents who remained in the electoral race after the major opposition party candidates had been jailed or exiled. Id. ¶ 524. Because the 2018 election was widely viewed as fraudulent, the United States derecognized

---

[2] Unless otherwise indicated, case quotations omit all internal quotation marks, alterations, footnotes, and citations.

Maduro in January 2019 and instead recognized Juan Guaidó, the president of the duly elected National Assembly of Venezuela, as Venezuela's Interim President. Defs.' Response to Pls.' 56.1 ¶ 8-9, 69, 526.

On January 23, 2019, the National Assembly declared Maduro's presidency illegitimate and appointed Guaidó as Interim President. Defs.' Response to Pls.' 56.1 ¶ 525. The National Assembly also authorized Guaidó to appoint the Ad Hoc Board of Directors for PDVSA (the "Ad Hoc Board"). Id. ¶ 528. The primary goal of the Ad Hoc Board was to protect PDVSA's assets abroad and manage numerous litigation matters throughout the U.S. Pls.' Response to Defs.' 56.1 ¶¶ 384-85. Accordingly, President Guaidó appointed new directors to the Ad Hoc Board, which then appointed new directors of PDVH. Id. ¶¶ 24, 26.

PDVSA's ongoing insolvency triggered a global race among creditors — including plaintiffs — to recover against its limited, yet highly valuable, oil-refining assets located in the United States, most notably the Citgo refining enterprise. Numerous creditors of Venezuela and PDVSA have secured writs of attachment against the shares of PDVH in connection with the Crystallex litigation, which has been pending in the U.S. District Court for the District of Delaware since 2018. Pls.' Response to Defs.' 56.1 ¶¶ 272-76, 307, 319-20. The Delaware District court is presently in the process of conducting a judicial sale of PDVH's

shares, which is scheduled to be completed later this year. Id.
56.1 ¶¶ 320-41.

Having been unable to recover in the Crystallex proceedings,
plaintiffs initiated this action in late 2023, seeking to hold
PDVSA liable on the Notes. In June 2024, plaintiffs expanded their
claims by initiating separate proceedings to hold PDVH liable under
an alter ego theory and to obtain turnover of PDVH's assets,
including its equity interest in Citgo Holding and its assets in
Citgo.

## II.  Legal Standards

### A. Summary Judgment

Summary judgment is warranted where the moving party shows
that "there is no genuine dispute as to any material fact" and
that it "is entitled to judgment as a matter of law." Fed. R. Civ.
P. 56(a). "The moving party bears the burden to demonstrate the
absence of any genuine issues of material fact." New York v.
Mountain Tobacco Co., 942 F.3d 536, 541 (2d Cir. 2019). If the
moving party does not bear the burden of proof at trial, its
summary judgment "burden will be satisfied" by showing "an absence
of evidence to support an essential element of the nonmoving
party's claim." Goenaga v. March of Dimes Birth Defects Found., 51
F.3d 14, 18 (2d Cir. 1995). Once "the moving party" has met its
"initial burden of establishing there are no genuine issues of
material fact, . . . the non-movant must 'set forth specific facts

-11-

showing that there is a genuine issue for trial.'" Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986)). "A material fact is one that would affect the outcome of the suit under the governing law, and a dispute about a genuine issue of material fact occurs if the evidence is such that a reasonable factfinder could return a verdict for the nonmoving party." Aetna Life Ins. Co. v. Big Y Foods, Inc., 52 F.4th 66, 72 (2d Cir. 2022).

Further, where, as here, "cross-motions for summary judgment are filed, a court must evaluate each party's own motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." Cayuga Nation v. Tanner, 6 F.4th 361, 373 (2d Cir. 2021).

   B. Veil-Piercing Claims

Plaintiffs' veil-piercing claims are governed by the Supreme Court precedent in First National City Bank v. Banco Para El Comercio Exterior de Cuba, 462 U.S. 611 (1983) ("Bancec"). The Bancec standard established an exception to the presumption of corporate separateness between foreign sovereigns and their instrumentalities that is firmly rooted in "basic legal principles, the FSIA's legislative history, and considerations of comity and respect for foreign sovereigns." Gater Assets Ltd. v. AO Moldovagaz, 2 F.4th 42, 55 (2d Cir. 2021). That presumption cannot be overcome unless plaintiffs show (1) "a corporate entity

-12-

is so extensively controlled by its owner that a relationship of principal and agent is created" or (2) that "recognizing the instrumentality's separate juridical status would work fraud or injustice." Id. In its Opinion and Order dated February 21, 2025, this Court dismissed plaintiffs' alter ego claims under the second prong of Bancec, addressing "fraud or injustice." In an Order dated March 27, 2025, the Court reaffirmed its ruling after a round of briefing on what plaintiffs purported to be newly discovered evidence.

Applying these principles, PDVH, a Delaware corporation, is entitled to a strong presumption that it is a separate and district juridical entity from PDVSA and Venezuela. One of the key issues here is whether PDVSA and Venezuela have so extensively controlled PDVH that this presumption can be overcome to pierce PDVH's corporate veil and use its assets to satisfy PDVSA's debts on the Notes acquired by plaintiffs. In this regard, the Second Circuit has held that "the touchstone inquiry is whether the sovereign state exercises significant and repeated control over the instrumentality's day-to-day operations." Moldovagaz, 2 F.4th at 55 (citing EM Ltd. v. Banco Cent. De La Republica Argentina, 800 F.3d 78, 91 (2d Cir. 2015) ("EM Ltd. II")); see also Walter Fuller Aircraft Sales, Inc. v. Republic of Philippines, 965 F.2d 1375, 1382 (5th Cir. 1992) ("[W]e look to the ownership and management structure of the instrumentality, paying particularly close

attention to whether the government is involved in day-to-day operations, as well as the extent to which the agent holds itself out to be acting on behalf of the government.").

In determining whether such "day-to-day" control existed, a court must consider such factors as whether the sovereign entity "(1) uses the instrumentality's property as its own; (2) ignores the instrumentality's separate status or ordinary corporate formalities; (3) deprives the instrumentality of the independence from close political control that is generally enjoyed by government agencies; (4) requires the instrumentality to obtain approvals for ordinary business decisions from a political actor; and (5) issues policies or directives that cause the instrumentality to act directly on behalf of the sovereign state." EM Ltd. II, 800 F. 3d at 91. However, this list is not exhaustive nor necessarily definitive and leaves the courts "with the task of assessing the availability of exceptions on a case-by-case basis." Rubin v. Islamic Republic of Iran, 583 U.S. 202, 210 (2018). Accordingly, in its determination, the court considers all relevant facts and historical events up to the present litigation. See OIEG, 73 F.4th at 172 (considering facts "up to the time of the service of the writ of attachment."); cf. EM Ltd. II, 800 F.3d at 92-94. Plaintiffs carry the burden of rebutting the presumption of separateness.

Generally, under the extensive-control prong of Bancec, there is no requirement for a nexus between the dominated instrumentality, here PDVH, and the alleged injury to plaintiffs. EM Ltd. v. Republic of Argentina, 473 F.3d 463, 477-78 (2d Cir. 2007) ("EM Ltd I"); see also Crystallex II, 932 F.3d at 142 (concluding that "requiring an independent nexus requirement would likely read the Bancec extensive-control test out of the doctrine" because "if the instrumentality were directly liable for the award, there would be no need to invoke Bancec at all").

## III. Discussion

### A. Jurisdiction

The Court's jurisdiction here is uncontested. 28 U.S.C. § 1330(a) grants federal-court jurisdiction over "any nonjury civil action" against a foreign sovereign, so long as the sovereign is properly served under 28 U.S.C. § 1608 and is not entitled to sovereign immunity. See 28 U.S.C. § 1330(a)-(b). The FSIA, 28 U.S.C. § 1602 et seq., "establishes a comprehensive framework for determining whether a court in this country, state or federal, may exercise jurisdiction over a foreign state." Republic of Argentina v. Weltover, Inc., 504 U.S. 607, 610 (1992). Under 28 U.S.C. § 1604, foreign sovereigns and their instrumentalities are entitled to sovereign immunity in the U.S. courts except as provided in 28 U.S.C. §§ 1605-1607. See 28 U.S.C. §§ 1603-1604. A court possesses subject matter jurisdiction over a suit against a foreign state

only if the plaintiff's claim falls within a statutorily enumerated exception. Verlinden B.V. v. Cent. Bank of Nigeria, 461 U.S. 480, 497-98 (1983). It is undisputed that PDVSA is an "agency or instrumentality" of Venezuela within the meaning of the FSIA. Defs.' Response to Pls.' 56.1 ¶ 9.

Section 1605 of the FSIA provides that a "foreign state shall not be immune from the jurisdiction of courts of the United States or of the States in any case . . . in which the foreign state has waived its immunity either explicitly or by implication." 28 U.S.C. § 1605(a)(1). Here, PDVSA has explicitly waived sovereign immunity under Article IX, Section 9.15(c) of the Notes Agreements. Defs.' Response to Pls.' 56.1 ¶ 10. Moreover, PDVSA was properly served under 28 U.S.C. § 1608(b) on December 20, 2023. G&A Strategic Invs. I LLC v. Petroleos de Venezuela, S.A., No. 23-CV-10766 (JSR), 2024 WL 4520067, at *2 (S.D.N.Y. Oct. 17, 2024). The Court has satisfied itself that it has subject matter jurisdiction under the FSIA.[3]

B. Liability on the Notes

PDVSA, PPSA, and PDVH have asserted a champerty defense in their respective answers, but not in their summary judgment briefing. Dkts. 94 at 100, 132 at 84. In any case, the Court agrees with the defendants that the champerty statute does not apply here because the "aggregate purchase price" of the Notes was "at least

---

[3] The Court's jurisdiction as to PPSA is likewise uncontested.

five hundred thousand dollars." N.Y. JUDICIARY LAW § 489(2). Specifically, Girard Street paid $13,051,000 to purchase the 2016 Halliburton Note while G&A purchased the 2017 Schlumberger Notes for $121,625,001.24. Defs.' Response to Pls.' 56.1 ¶¶ 112, 121.

In their opposition to plaintiffs' motion for summary judgment, defendants do argue, however, that summary judgment on Counts I and II (liability on the Notes) is precluded by plaintiffs' lack of standing.[4]

In this regard, defendants originally argued that plaintiffs are not entitled to summary judgment confirming PDVSA's and PPSA's liability on both sets of Notes because genuine disputes of material fact existed as to whether the Notes were properly assigned to plaintiffs. At the oral argument, however, counsel for PDVSA conceded that there are no triable issues of fact as regards the proper assignment of the 2016 Halliburton Note to plaintiff Girard Street.[5] Focusing instead on the 2017 Schlumberger Notes

---

[4] In the same action of their brief relating to standing, PDVH also raises the affirmative defense of laches. Because laches ordinarily operates to bar an "equitable claim where [plaintiff] is guilty of unreasonable and inexcusable delay that has resulted in prejudice to the defendant," Leopard Marine & Trading, Ltd. v. Easy Street Ltd., 896 F. 3d 174, 193 (2d Cir. 2018), the Court construes defendants' laches defense as applicable not to standing, but to the alter ego claims, which also lie in equity. Accordingly, the Court addresses this defense jointly with defendants' other equitable arguments infra in Section E on "Equitable Considerations."

[5] In any case, the Court concludes that the 2016 Halliburton Note was also properly assigned to Girard Street in an offshore transaction conducted in accordance with Regulation S under the

assigned through a series of intermediaries to G&A, defendants, in essence, have raised two arguments in connection with standing. First, in response to plaintiffs' assertion that plaintiffs are holders in due course under Article 3 of the Uniform Commercial Code ("U.C.C."), §§ 3-302, 3-303, defendants counter that because G&A acquired the 2017 Schlumberger Notes from Cowen on October 29, 2018, knowing fully well that the Notes were in default, that knowing action disqualified them from holding a status of holder in due course under the U.C.C. Additionally, defendants urged that SFBV, the first entity in the series of assignments, was an "Ineligible Transferee" under Section 9.04(b) of the Note Agreement. Pls.' Ex. 16 at 1074; Pls.' Ex. 17 at 39. In doing so, they rely on a November 14, 2017 letter from PDVSA to Schlumberger, which states that SFBV, "an entity organized and existing under the laws of the Kingdom of the Netherlands (the 'Transferee'), qualifies as an Ineligible Transferee under the Note Agreement," and that for that reason, "the assignment of the Notes may only be carried out by providing notice . . . and obtaining consent of the Issuer[.]" Defs.' Ex. 302A.

Nevertheless, in the very same letter, PDVSA affirmed its "express [] consent to said assignment, subject to the fulfillment

_____

Securities Act, as permitted by § 3.02(e)(B) of the Note Agreement. Defs.' Response to Pls.' 56.1 ¶ 125-27; Pls.' Ex. 17 at 920, 937 & PX 134 at 668.

of the remaining documentary requirements set forth in Section 2.11" and other conditions that are not challenged here. Id. Furthermore, a holder in due course is a holder who takes the instrument: "(a) for value; and (b) in good faith; and (c) without notice that it is overdue or has been dishonored or of any defense against or claim to it on the part of any person." N.Y. U.C.C. § 3-302(2). "[A] holder in due course acquires a negotiable instrument free of all claims by any person, and all defenses of any party to the instrument with whom the holder has not dealt, except for five statutory exceptions" that are not applicable here. Fid. Bank, Nat. Ass'n v. Avrutick, 740 F. Supp. 222, 226 (S.D.N.Y. 1990); see also N.Y. U.C.C. § 3-305(2) (enumerating the statutory exceptions). That SFBV took the 2017 Schlumberger Notes for value and in good faith is undisputed. SFBV also took the notes without any notice that they were overdue because the 2017 Schlumberger Notes were assigned to SFBV on July 20, 2017 and the first payment on the Notes was due on August 4, 2017. SFBV was thus a holder in due course within the meaning of U.C.C. § 3-302(1), not subject to any defenses here discussed. Accordingly, "plaintiff[s] enjoyed the status of a holder in due course because it is the assignee of such a holder." DH Cattle Holdings Co. v. Kuntz, 165 A.D.2d 568 (N.Y. App. Div. 1991). And, in any case, even if (contrary to fact) the assignment to SFBV was initially invalid, PDVSA made an interest payment under the 2017 Schlumberger Notes to SFBV, and

-19-

not to Schlumberger, thereby legally validating the transfer from Schlumberger to SFBV. See Pravin Banker Assocs. v. Banco Popular Del Peru, 109 F.3d 850, 856 n.2 (2d Cir. 1997); Defs.' Response to Pls.' 56.1 ¶ 138.[6] In short, the Court rejects defendants' arguments regarding standing.

### C. Alter Ego Liability

The Court now turns to the merits of plaintiffs' argument that PDVH is PDVSA's alter ego. In support of their argument, plaintiffs primarily adduce the following evidence: (1) sporadic instances of financial assistance from PDVH to PDVSA, in the form of a one-time outsized dividend issuance and an extension of a loan against PDVH's assets; (2) conduct attributable not to PDVH, but its subsidiaries such as purchases of services and equipment with funds belonging to PDVSA or PPSA; (3) lack of corporate formalities, mostly consisting of appointments of board members to PDVH and its subsidiaries; (4) Venezuelan laws that purportedly

---

[6] The other conditions under the Note Agreement were fulfilled as well. As the November 14, 2017 letter recognized, Section 9.04(b) of the Note Agreement requires that any assignment meets the obligations set forth in Section 3.02(e) concerning registration under the Securities Act or any other applicable securities law. Defs.' Ex. 302A. The same provision also requires the Noteholder, before any offer, sale or other transfer, to provide a legal opinion that the note transfer is exempt from any registration requirements under the Securities Act. Pls.' Ex. 16. PDVSA agreed in that letter that the assignors' August 2017 legal opinion was "acceptable . . . in both form and substance," and "approve[d] said legal opinion." DX 302(A) at 357.

imposed a requirement on PDVH to obtain prior approval from PDVSA before executing any transactions (but without evidence that such prior approvals were actually required or obtained in practice); and (5) PDVH's lobbying activities and its corresponding registration under the Foreign Agents Registration Act ("FARA"). Even viewed in the light most favorable to plaintiffs, these facts show that PDVSA exercised powers typical of a sole and controlling shareholder or, at most, that PDVSA on a few isolated occasions intruded in PDVH's affairs. Even so, as detailed below, the totality of the evidence of record does not establish that PDVSA "exercise[d] significant and repeated control over the instrumentality's day-to-day operations," EM Ltd. II, 800 F.3d at 91, such that plaintiffs can "overcome" the strong "presumption" in favor of the "independent status" of PDVH. Bancec, 462 U.S. at 627-29.

> i. *PDVSA's alleged use of PDVH's property as its own*

As this Court recognized in its prior decision, PDVSA's chief contention under the extensive-control prong of Bancec is that "while deliberately and repeatedly ignoring PDVSA's creditors' claims, PDVH's profits 'ultimately [ran] to the Venezuelan government' via PDVSA's control of PDVH." Dkt. 188, at 24 ("Pls.' Mem. in Support of Their Mot. for SMJ"). Plaintiffs' assertion that PDVSA used PDVH's property as its own rests primarily on the following facts: (1) a large dividend paid in 2015 by Citgo and

Citgo Holding to PDVH that plaintiffs allege was funneled to PDVSA and eventually to Venezuela ("2015 Dividend Payment"); (2) PDVH's pledge of its equity in Citgo Holding, allegedly without any benefit to PDVH ("2016 Pledge"); (3) PDVSA's alleged use of U.S. subsidiaries of PDVH to obtain funding and to pay for PDVSA's expenses.

Although there is no bright-line rule delineating when a controlling sole shareholder crosses the threshold from lawfully exercising shareholder rights to impermissibly disregarding corporate separateness, courts have developed instructive standards for identifying when a parent treats a subsidiary as a mere shell. Specifically, the courts recognize that the level of control a parent exerts over the subsidiary's assets must be exceedingly strong, including, for example, the parent's direct use of the subsidiaries' assets, often for a small or no benefit to the subsidiary, or instances of comingling of assets. For example, the Third Circuit held that such extensive economic control existed where Venezuela required PDVSA to acquire various companies and assets and dictated "to whom PDVSA must sell oil to and at what price," including a sale of oil "for no, or de minimis, consideration" or sales to political allies at a "steep discount." Crystallex II, 932 F.3d at 146-47. In the same case, Venezuela also ordered PDVSA to directly or indirectly fund "social programs and other public expenditures" that had "nothing to do with"

PDVSA's core business, including funding "PDVSA Agrícola S.A., which subsidizes Venezuela's agriculture, industrial infrastructure, and produce sectors, and PDVSA Desarrollos Urbanos S.A., which subsidizes Venezuela's housing projects." Crystallex I, 333 F. Supp. 3d at 409.

Similarly, in another case, United States Fidelity and Guaranty Co. v. Braspetro Oil Services Co., a court in this district found that Braspetro used its subsidiary Brasoil's bank accounts for its own "worldwide transactions" and that Braspetro's parent "deposited funds in Brasoil's bank account in New York and made millions of dollars of advance payments from that account . . . without seeking approval from Brasoil," No. 97 CIV. 6124 (JGK), 1999 WL 307666, at *9-10 (S.D.N.Y. May 17, 1999), aff'd, 199 F.3d 94 (2d Cir. 1999). In yet another case, the Second Circuit held that Nigeria used the property of a subsidiary as its own where Nigeria shared accounts with the subsidiary, maintained offices on its properties without rent, and donated to the government valuable equipment for no obvious benefit to the company, and where a Nigerian statute that created the subsidiary required it to "engag[e] in activities that would enhance the petroleum industry in the overall interest of Nigeria." Esso Expl. & Prod. Nigeria Ltd. v. Nigerian Nat'l Petroleum Corp., 40 F.4th 56, 69-70 (2d Cir. 2022)

On the other hand, the Second Circuit has also held that the plan of Argentina's government to borrow money from its central banking authority was "not indicative of the extensive control that concerned the Supreme Court in Bancec," where the loan "proposals received the necessary review and approval by BCRA's legal advisers and BCRA's Board of Directors, and [where] one BCRA Governor testified before Argentina's Congress that it made policy sense to permit the government to borrow funds from BCRA while its reserves earned relatively low interest." EM Ltd. II, 800 F.3d at 94. Similarly, "[a]n entity does not become a sovereign's alter ego merely because it "assist[s]" the sovereign in carrying out the sovereign's 'policies and goals.'" Moldovagaz, 2 F. 4th at 55.

With these illustrative cases in mind, the Court turns to plaintiffs' specific allegations.

*2015 Dividend*: Plaintiffs contend that while Venezuela and PDVSA continued to evade creditors, PDVSA directed Citgo to issue billions of dollars in dividends that were distributed upstream to PDVSA without any benefit to Citgo. In particular, plaintiffs assert that in 2015, Citgo Holding incurred approximately $2.8 billion in secured debt — backed by pledges of Citgo shares and other assets — to fund a special $2.2 billion dividend to PDVSA. Defs.' Response to Pls.' 56.1 ¶¶ 260, 283, 286. Further, the total dividend distributed from Citgo Holding to PDVH in 2015 (which amounted to $2.56 billion) was approximately 2.8 times Citgo

-24-

Holding's 2015 net earnings. Id. ¶¶ 260-63, 287, 291.[7] However, as prior cases establish, it is not unusual for subsidiaries to provide financial assistance to their parent companies in times of financial distress, whether through debt or issuance of dividends. This is particularly so where, as here, such transactions are accompanied by the observance of corporate formalities and supported by a solvency opinion. Bancec, 462 U.S. at 624; see also EM Ltd. II, 800 F.3d at 94 (finding that the fact that the Central Bank provided funds to the sovereign to assist "in responding to an extremely severe debt crisis" was insufficient to pierce the corporate veil); Moldovagaz, 2 F.4th at 61 (isolated statements that the subsidiary paid off some of the sovereign's debt "do not suffice to establish extensive control by the sovereign over a corporation"); Transamerica Leasing, Inc. v. La Republica de Venezuela, 200 F.3d 843, 852 (D.C. Cir. 2000) (Venezuela's provision of funds to one of its instrumentalities "in order to

---

[7] The parties dispute the comparative size of the 2015 Dividend and its impact. Defendants argue that the magnitude of the 2015 Dividend recapitalization was "not abnormal" when compared to peer petroleum companies' dividends or other means of returning capital to stockholders. Pls' Response to Defs.' 56.1 ¶ 48(a)-(b). Defendants also argue that the dividend did not prevent either PDVH or its subsidiaries from operating profitably or remaining adequately capitalized. Defs.' Resp. to Pls.56.1 ¶¶ 233-34. Plaintiffs contest that the dividend ratio was approximately 10 times higher than the ratios of other comparable refining companies such as Phillips 66, Valero, and Marathon by one measure, and over 3 times higher than the ratios of peers by another measure. Defs.' Response to Pls' 56.1 ¶ 290.

reorganize the ailing company and to bail it out of debt" did not suggest alter ego).[8]

The undisputed facts show that PDV America (later Citgo Holding) borrowed up to $3 billion that PDVH was to use to "fund [a] cash dividend to its shareholder[,]" PDVSA, subject to professional evaluation of the transaction. Defs.' Response to Pls.' 56.1 ¶ 261. To this end, PDVH retained Young Conaway Stargatt & Taylor to advise PDVH on the requirements of Delaware law and Houlihan Lokey to render a solvency opinion. Id.; Pls.' Exs. 232, 255. On February 11, 2015, after receipt of the solvency opinion, PDVH authorized a dividend recapitalization pursuant to which it declared the dividend. This dividend was duly recorded in PDVH's corporate books and records. Pls.' Response to Defs.' 56.1 ¶¶ 42-46; Defs.' Exs. 73 & 74.[9] The PDVH Board resolved that the

_____

[8] The 2015 Dividend, and the debt covenants associated with the loans that funded it, restricted Citgo's ability to pay dividends while servicing the debt between 2015 and 2019. Defs.' Response to Pls.' 56.1 ¶ 305. In effect, this meant that PDVSA traded away its future dividends for this one-time payment in 2015.

[9] Plaintiffs argue that most of these corporate formalities were "sham" or "not genuinely independent" and argue that PDVH was but a puppet in PDVSA's scheme to extract value from the CITGO entities. But these assertions are conclusory and not evidenced by the facts of record. See Defs.' Ex. 75 (October 14, 2014 PDVH Board resolution to explore financing for $2.5 billion dividend); Defs.' Ex. 73 (January 7, 2015 correspondence with Citgo personnel re: financing for 2015 Dividend); Defs.' Ex. 74 (January 2015 correspondence with Citgo personnel negotiating such financing); Defs.' Ex. 76 (solvency opinion received prior to approval of 2015 Dividend); Defs.' Resp. to Pls.' 56.1 ¶ 351 (citing September 7, 2016 correspondence in which Citgo personnel learn of proposed October 2016 pledge).

dividend issuance was "advisable and in the best interest of the Company and its sole stockholder." Id. The final financing arrangement underlying the 2015 dividend was negotiated in part by Citgo personnel and external legal counsel. Id.

This single dividend distribution, which occurred nearly a decade ago — although significant in amount — was accompanied by appropriate corporate formalities and does not support the inference that PDVSA disregarded PDVH's separate legal status or treated PDVH as a mere shell. There is plainly no evidence that PDVH's financial viability was ignored or that its internal processes were or could be bypassed.

Plaintiffs argue that the transaction served "no commercial purpose for PDVH, such as repayment of obligations to creditors within the corporate chain." Pls.' Consolidated Mem. in Opp. to Defs.' Motion for SMJ at 7 (Dkt. No. 201); Defs.' Response to Pls.' 56.1 ¶¶ 302–04. However, absent extraordinary circumstances — such as a repeated pattern of self-dealing, pervasive disregard of corporate separateness, or conduct that renders the subsidiary insolvent — courts do not second-guess the motives behind a parent company's receipt of lawfully declared dividends from its wholly owned subsidiary. No such extraordinary circumstances are present here. And, in any case, the Court cannot credit plaintiffs' allegations because defendants produced evidence that around the time of the issuance of the 2015 Dividend, PDVSA reduced its total

financial debt by approximately $4.1 billion, its total current liabilities by roughly $3.4 billion, and its total non-financial liabilities by approximately $23.6 billion. Pls.' Response to Defs.' 56.1 ¶ 49(a).[10] This evidence supports the conclusion that the dividend transaction, far from lacking a purpose, was part of a broader effort to reduce PDVSA's financial liabilities.

In a similar vein, plaintiffs also argue, without any supporting case law, that it is improper for a parent to "extract value" from its subsidiaries unless there is a "corresponding benefit" to the subsidiaries. Pls.' Mem. in Support of Their Mot. for SMJ, at 27, 10. This argument is unconvincing. One of the main purposes of corporate form is to, inter alia, manage risks, and a parent company will often use subsidiaries to generate profits for the parent while decreasing the parent's exposure to risk. Moreover, under Delaware law (the law of incorporation of PDVH), the directors of a subsidiary have a fiduciary duty to act in the best interest of its parent company, here PDVSA. Anadarko Petroleum Corp. v. Panhandle E. Corp., 545 A.2d 1171, 1174 (Del. 1988). Furthermore, given that the issuance of dividends from a subsidiary

---

[10] Plaintiffs dispute this statement as "immaterial" and argue that "any decrease in the monetary value of PDVSA's debt between 2014 and 2015 as reported on its financial statements does not represent a genuine reduction of debt, but merely reflects the government's decision to monetize its fiscal deficits by increasing the rate of money creation (devaluation) and generating high levels of inflation." Plaintiffs' contentions are conclusory and unsupported in facts by any evidence in the record.

to its parent is a regular business activity, it is insufficient, without more, to use any such one-time dividend as a basis to pierce PDVH's corporate veil.

*2016 Pledges*: Plaintiffs further argue that in September and October 2016, at PDVSA's direction and PDVH's expense, and without PDVH receiving any consideration in exchange, PDVSA caused PDVH to pledge 50.1% of its equity in Citgo Holding to secure certain of PDVSA's obligations and avoid default on these obligations by PDVSA ("October 2016 Pledge").[11] Defs.' Response to Pls.' 56.1 ¶¶ 337-81. Mr. Jesús Enrique Luongo (who served simultaneously as President of PDVH and PDVSA), signed the relevant pledge agreement. Defs.' Response to Pls.' 56.1 ¶ 210. Then, in November 2016, PDVH's board pledged the remaining 49.9% of PDVH's equity in Citgo Holding to secure a loan to PDVSA from a Russian state-owned oil company, Rosneft Trading S.A. ("Rosneft") ("November 2016 Pledge," and together with the "October 2016 Pledge," the "2016 Pledges"). Defs.' Response to Pls.' 56.1 ¶¶ 337-81. Admittedly, the loan was not a particularly good deal: just two months before this transaction, Credit Suisse had valued 50.1% of the Citgo Holding

---

[11] Specifically, PDVH, for the benefit of PDVSA, exchanged $2.8 billion in 2017-maturing unsecured bonds for $3.4 billion in new bonds due in 2020, now backed by PDVH's Citgo Holding shares rather than PDVSA's own assets. Defs.' Response to Pls.' 56.1 ¶ 337-43.

stock at over $4 billion, while the loan amount obtained was just a fraction of this amount.[12]

The 2016 Pledges, like the 2015 Dividend, were executed during a period of acute financial distress for PDVSA and were intended to generate liquidity for the parent company. To be sure, the transaction provided no direct benefit to PDVH — apart from the obvious and critical benefit of keeping its parent company afloat. Defs.' Response to Pls.' 56.1 ¶¶ 346–50.

It may also be true that the PDVH, Citgo, and Citgo Holding shareholder reports even openly recognized the transaction had a political aspect. One such report acknowledged that the exchange as "a last attempt to finance the suffocated Maduro regime." Defs.' Response to Pls.' 56.1 ¶ 581. For those and other reasons, the validity of the October 2016 Pledge is the subject to a separate and ongoing litigation. See generally Petroleos de Venezuela, S.A.

---

[12] The parties dispute the amount of the loan that was secured by the 49.9% collateral interest in Citgo Holding. Plaintiffs contend that only a single $485 million advance was secured pursuant to the November 2016 Pledge Agreement, whereas Defendants maintain that the entire $1.5 billion loan extended by Rosneft, plus interest, was secured by the pledge. Defs.' Response to Pls' 56.1 ¶ 374–76. Regardless of the precise loan amount secured, this factual dispute does not alter the Court's conclusion that the loan terms were favorable to Rosneft. More importantly, the magnitude of the collateralized loan does not affect the overarching legal conclusion: that a one-time instance in which a subsidiary facilitates a loan for its parent — absent extraordinary circumstances such as insolvency, fraud, or pervasive disregard of corporate formalities — is insufficient to justify piercing of the subsidiary's corporate veil.

et al. v. MUFG Union Bank, N.A., et al., 19-cv-10023 (S.D.N.Y.).
For the limited purpose of adjudicating the instant motion,
however, the Court assumes — without deciding — the validity of
that pledge.

In any event, none of this supports plaintiffs's alter-ego
theory. The 2016 Pledges, like the 2015 Dividends, were formally
approved by the PDVH Board. The record does not support the
conclusion that such transactions "rise above the level that
corporations would normally tolerate from significant
shareholders," nor do they, standing alone, establish that PDVSA
exercised day-to-day control over PDVH. Moldovagaz, 2 F.4th at 56.
That the underlying loan perhaps disproportionately favored
Rosneft may bear out a claim in a different litigation. The
particulars of the business wisdom of this transaction, however,
are irrelevant to the Court's inquiry into the existence of an
alter ego relationship between PDVSA and PDVH except for more
extreme circumstances than are present here.

Rather, the structure of the transaction and the
contemporaneous observance of corporate formalities further
reinforce the conclusion that PDVSA did not treat PDVH's assets as
its own. Indeed, in EM Ltd. II, the Second Circuit held in parallel
circumstances that Argentina's "plan to borrow money" from its
central bank was "not indicative of the extensive control that
concerned the Supreme Court in Bancec" where the plan "was not

executed by the Argentine government alone," but instead "received the necessary review and approval by BCRA's legal advisers and" its board of directors. 800 F.3d at 94. Moreover, the facts here are readily distinguishable from those in Funnekotter v. Agricultural Dev. Bank of Zimbabwe, where a court in this district found that the defendant instrumentality "was forced to repay a loan Zimbabwe received from third parties using [the instrumentality's] share of dividends from a mining project, to turn over the majority of its interest in a mining joint-venture to the National Army of Zimbabwe, and to permit Zimbabwe to retain revenue from certain other joint ventures in which ZMDC partnered with the government." 2015 WL 9302560, at *6; see also Braspetro, 1999 WL 307666, at *9-10 (finding an alter ego relationship where the parent company used the subsidiary's accounts as its own). Accordingly, the Court concludes that the 2016 Pledges do not establish the level of domination or disregard of corporate separateness necessary to pierce the corporate veil.

*Allegations regarding PDVH's subsidiaries:* Plaintiffs allege that the subsidiaries of PDVH — PDV USA, PDV Chalmette, and LDC Supply — made expenditures on PDVSA's behalf that were of no benefit to those entities and were instead an alternative to issuing dividends to PDVSA or "workarounds . . . inconsistent with standard practices between parents and subsidiaries." Pls.' Mem. in Support of Their Mot. for SMJ, at 27.

As the Court has previously held, the conduct of PDVH's subsidiaries is not probative of whether PDVH itself is PDVSA's alter ego. At oral argument, plaintiffs argued that because PDVH is a holding company, the Court should expand its veil-piercing analysis to include PDVH's wholly owned subsidiaries. The Court declines to do so.

Plaintiffs cite no authority — and the Court is aware of none — for the proposition that holding companies are categorically exempt from the presumption of corporate separateness. Plaintiffs' theory, if adopted, would collapse the corporate form for any holding company within a multinational structure — an outcome not supported by Bancec or its progeny. Moreover, if plaintiffs' argument held, there would be no principled reason not to direct their veil-piercing claim at other related entities such as Citgo, the subsidiary that conduct "real" business operations. Yet the Court sees no evidence adduced by plaintiffs of PDVSA controlling Citgo's day-to-day refining operations.

In any case, the evidence before the Court pertaining to PDVH subsidiaries is insufficient to show that the service-purchasing arrangements between PDVSA or its wholly owned affiliate, PPSA, and various U.S. subsidiaries, that came to be colloquially known within Citgo as "crude-offsets," were predominantly used to extract value from those subsidiaries. The crude-offset mechanism operated as follows: Prior to the 2019 sanctions imposed on

-33-

Venezuela and PDVSA, Citgo regularly procured crude oil from PDVSA and its affiliates, including in particular from PDVSA's wholly owned Venezuelan affiliate, PPSA. Under the applicable purchase agreements, payments for crude oil purchases were due within 30 days of delivery. In the interim 30-day period, Citgo frequently received instructions from PDVSA or its subsidiaries directing it to allocate a portion of the money owed for the crude purchases toward other uses. These included, for example, the procurement of equipment or supplies for PPSA or PDVSA, satisfaction of obligations owed by PPSA or PDVSA to Citgo or third parties, or capital contributions to PDVH.[13] The expenditures were then offset against the total amount Citgo paid to PPSA for the crude oil — hence, "crude offsets." The transactions were generally recorded and disclosed in Citgo's financial statements.[14] The practice continued until 2019, when the U.S.-imposed sanctions prohibited Citgo from dealing with Maduro-controlled PDVSA and its

_____

[13] As a further variation on the agreements, Citgo and PDVSA entered into procurement agreements whereby Citgo purchased for PDVSA specialized goods, materials or equipment in exchange for a service fee. Instead of paying the fee, the agreement also authorized PDVSA to use the funds owed to PPSA for crude oil delivered to Citgo. Pls.' Response to Defs.' 56.1 ¶ 163(j). Plaintiffs dispute that the services were performed for a fee, merely because the agreement did not identify concrete price terms. In the absence of evidence that PDVSA did not in fact pay for these goods and services with crude offsets, this objection is irrelevant to Court's conclusions.

[14] Plaintiffs dispute that several of the transactions between January 1, 2016 through March 31, 2018 had proper authorization or documentation. Pls.' Response to Defs.' 56.1 ¶ 163(f),(g).

affiliates. Pls.' Response to Defs.' 56.1 ¶ 163(g). The Court concludes that absent additional evidence, these arrangements do not establish that PDVSA treated the property of its subsidiaries as its own, as the funds involved — representing amounts owed for crude purchases — belonged either to PDVSA or its affiliate, PPSA.

Taking a different tack, plaintiffs argue that a similar arrangement between PDVSA and LDC that was entered into after the U.S. imposed sanctions on Venezuela and PDVSA in 2019 demonstrates extensive control because those funds were used to pay for, inter alia, Venezuela's legal expenses and interest on the 2020 bonds, which were secured by the 2016 Pledge. Pls.' Mem. in Support of Their Mot. for SMJ at 14–15.[15] However, the record reflects that these expenditures were primarily made from direct advances provided by PPSA to LDC for the purchase of diluents that were ultimately never delivered because of U.S. sanctions prohibiting such transactions. Pls.' Response to Defs.' 56.1 ¶ 165(i).

----

[15] LDC was established to provide procurement services to PPSA, specifically to acquire diluents necessary for the processing of heavy crude oil produced by PPSA. These diluents were essential to enable certain grades of heavy crude to be refined as lighter crude or naphtha. See Pls.' Response to Defs.' 56.1 ¶ 165. Prior to 2019, LDC and PPSA entered into a procurement services agreement pursuant to which LDC agreed to procure diluents on PPSA's behalf. These purchases were frequently structured as prepayments, offset by deliveries of crude oil. Id.; Defs.' Response to Pls.' 56.1 ¶. 450.

For example, a portion of the $91 million in payables owed to PPSA and retained by LDC as a consequence of the sanctions was later used — pursuant to a license issued by OFAC — to satisfy interest payments on the 2020 bonds. Id. ¶ 165(j). OFAC subsequently issued another license authorizing LDC to "use certain blocked residual payables" for the reimbursement of the Ad Hoc Board for its administrative expenses and for litigation-related expenses involving PDVSA. Id ¶ 165(l). These transactions, even if they could be somehow attributed to PDVH, do not establish that PDVSA used PDVH's or even PDVH's subsidiaries as its own. The funds at issue were originally owned by PDVSA or PPSA and were disbursed not only in accordance with internal corporate procedures but also under express authorization from OFAC. Cf. Esso, 40 F.4th at 70 (piercing corporate veil where the sovereign operated rent-free from the subsidiary's property, co-mingled finances, and where the subsidiary donated to the government valuable equipment contrary to the recommendations of its own board). Furthermore, to the extent that plaintiffs allege that these payments on the bonds gave preferential treatment to some creditors but not others, that fact is not relevant to a veil-piercing piercing claim. Moldovagaz, 2 F.4th at 62-64.

Finally, plaintiffs advance that PDVSA "caused PDVH to form and capitalize a subsidiary, Citgo Aruba, to refurbish, operate, and maintain a refinery" and that PDVSA directed PDVH to guarantee

"the debt of Citgo Aruba and its subsidiaries." Pls.' Mem. in Support of Their Mot. for SMJ, at 9; Defs.' Response to Pls.' 56.11 ¶¶ 473-79. This assertion lacks evidentiary support. The formation and capitalization of Citgo Aruba were independently approved by the boards of both PDVSA and PDVH. Id. ¶ 473. Moreover, even assuming that PDVSA sought to advance and encourage this investment, such strategic and programmatic conduct falls within the prerogatives of a controlling shareholder and is insufficient, standing alone, to establish the type of "significant and repeated control over . . . day-to-day operations" necessary to support veil-piercing. EM Ltd. II, 800 F.3d at 91.

> ii. *PDVSA's alleged ignorance of PDVH's separate status or ordinary corporate formalities*

Turning to the next Bancec factor, the Court observes that PDVH has generally adhered to corporate formalities. These include the issuance of stock certificates, maintenance of articles of incorporation and bylaws, declaration and payment of dividends, election of directors, filing of annual reports and tax returns, and the keeping of books and records "that would evidence the workings of an actual corporation," such as "resolutions, minutes, or the like" in accordance with the requirements of Delaware law, the jurisdiction of PDVH's incorporation. Shantou Real Lingerie Mfg. Co. v. Native Grp. Int'l, Ltd., 401 F. Supp. 3d 433, 440 (S.D.N.Y. 2018); 1 William Meade Fletcher, Fletcher Cyclopedia of the Law of Corporations § 41.31 (Sept. 2024); compare with

Crystallex I, 333 F. Supp. 3d at 402 (finding an alter-ego relationship where, inter alia, Venezuela's Oil Ministry and PDVSA share physical office space and where PDVSA's Articles of Incorporation confirm that it is required to adhere to the guidelines and policies established or agreed upon by the National Executive).[16] PDVH also has its own board of directors and its own officers, appointed and removed by PDVSA through duly executed meeting resolutions or stockholder's written consents. Pls.' Response to Defs.' 56.1 ¶¶ 78-86, 93-96, 111, 115-17.

Plaintiffs nevertheless contend that the Venezuelan government — under both Presidents Chávez and Maduro — treated PDVSA and its subsidiaries as extensions of the state, as evidenced by the direct appointment of Citgo presidents and directors of PDVSA and PDVH. To be sure, the undisputed facts show that PDVSA appointed directors of PDVH, which was within its powers as the parent company, and at times, those directors held positions on the boards of more than one of PDVSA, PDVH, Citgo Holding, and Citgo. Defs.' Response to Pls.' 56.1 ¶ 207. For example, Mr. Jordá, the current President and CEO of Citgo, has also served as the Director of Citgo, Citgo Holding, and PDVH and held other positions

---

[16] Citgo provides PDVSA and PDVH with corporate procurement services for the purchase of specialized goods, materials or equipment in exchange for a service fee. Pls' Response to Defs.' 56.1 ¶ 98, 163(j). The agreement provided that PDVSA was authorized to direct the use of funds owed to PPSA for crude oil delivered to Citgo. Id.

at PDVSA. Defs.' Response to Pls.' 56.1 ¶ 215. Furthermore, in 2019, the National Assembly made a proposal to PDVH, Citgo Holding, and Citgo to install certain slates of directors, and these directors were, in fact, duly appointed a few days after in all instances but one where, in the case of Oswaldo Nuñez, the boards of PDVH and Citgo Holding refused to appoint this candidate. Id. ¶¶ 61-65; see also ¶¶ 202-16 (regarding the appointments to PDVH's subsidiaries during the Maduro regime); Pls.' Response to Defs.' 56.1 ¶ 390. As noted, the court in Crystallex found PDVSA to be an alter ego of the Venezuelan state and PDVSA's influence, as the controlling shareholder, over the board appointments is undisputedly strong; but it is widely recognized that such an "exercise of power [is] incidental to ownership." EM Ltd. II, 800 F.3d at 92-93. That is, such conduct is commonplace among shareholders — especially controlling ones — and does not by itself establish day-to-day operational control. To overcome the Bancec presumption of separateness, the control exercised by the parent must rise "above the level that corporations would normally tolerate from significant shareholders or expect from government regulators." Moldovagaz, 2 F.4th at 55-56. The evidence here does not support a finding of such extraordinary control. To the contrary, the refusal to appoint Mr. Nuñez to the board reflects a measure of independent judgment by PDVH and its subsidiaries.

Plaintiffs also rely on Article 15 of Venezuela's Transition Statute, which created the PDVSA Ad Hoc Board and authorized it to "assume the direction and administration" of state-owned companies, including foreign subsidiaries, "for the purpose of appointing administrators and, in general, adopting the measures necessary to control and protect State company assets" to show the pervasiveness of PDVSA's control. Defs.' Response to Pls.' 56.1 ¶ 528. First, as this Court has already held, to the extent that this authorization pertains to any appointments made to the subsidiaries of PDVH, that evidence is irrelevant to the sole question at hand – i.e., whether PDVH is the alter ego of PDVSA. And even assuming arguendo that the appointments to the boards of subsidiaries were relevant, "courts have consistently rejected the argument that the appointment or removal of an instrumentality's officers or directors, standing alone, overcomes the Bancec presumption," EM Ltd. II, 800 F.3d at 92 (footnote omitted) because the exercise of such powers is "not synonymous with control over the instrumentality's day-to-day operations." Id. at 93. But plaintiffs have adduced no evidence that the PDVSA Ad Hoc board actually controlled the operations of its subsidiaries. In the context of Venezuela's internal political conflict, this articulation of authority in Article 15 appears to reflect a reiteration of existing shareholder powers — to be vested in the PDVSA Ad Hoc Board rather than Maduro-controlled PDVSA — rather

than a specific expansion of such powers. Indeed, consistent with this conclusion, the Transition Statute explicitly authorized the Ad Hoc Board to appoint a board of directors for PDVH. Pls.' Response to Defs.' 56.1 ¶ 24.

In conclusion, then, while this Court finds that PDVSA wields considerable power over the appointments of the directors of PDVH, it finds that the evidence is notably lacking to show that PDVSA consistently "use[d] its influence over these directors in order to interfere with the instrumentality's ordinary business affairs." EM Ltd. II, 800 F.3d at 93. This is inconsistent with the finding of pervasive operational control necessary to pierce PDVH's corporate veil.

> iii. *PDVSA alleged deprivation of PDVH of independence from close political control & requirement that PDVH obtain approvals for ordinary business decisions*

Plaintiffs' arguments under the EM Ltd. II factors primarily rely on legislative actions undertaken, first, by the Maduro government to consolidate control over PDVSA and its valuable U.S.-based subsidiaries, and then, after 2019, by the National Assembly, attempting to wrest power away from Maduro's illegal regime. Specifically, between December 2017 and April 2018, the Maduro government (shortly before it was derecognized by the United States) enacted laws granting the Venezuelan Minister of Petroleum broad control over PDVSA and its subsidiaries (including PDVH). These laws (1) authorized oversight of their administration and

by-laws; (2) mandated government review of their contracts; (3) required strict compliance with PDVSA's directives "to evaluate compliance with the legal, financial, budgetary, and technical requirements;" and (4) specifically required PDVH and its subsidiaries to obtain PDVSA's president's sign-off before validly entering into any contracts subject to PDVSA's control (the "Maduro laws"). Defs.' Response to Pls.' 56.1 ¶¶ 517-21. Following the United States' recognition of the National Assembly as Venezuela's legitimate governing body in 2019, the Transition Statute enacted by the National Assembly imposed its own set of restrictions on PDVH. These included a strategic requirement that the PDVH board operate under "commercial efficiency criteria," subject "to the control and accountability mechanisms exercised by the National Assembly[.]" Id. ¶¶ 530-45. The statute further barred the appointment of directors affiliated with the Maduro regime and prohibited the payment of dividends to any entity above PDVH (together, the "National Assembly directives"). Id.

With respect to the Maduro laws, the parties have submitted conflicting expert opinions regarding their extraterritorial applicability to PDVH, a Delaware corporation. Compare Defs.' Ex. 1 (Expert Report of H. Briceño León (Jan. 29, 2025)) at Section V (concluding that the Maduro laws do not apply extraterritorially) with (Expert Report of Dr. Díaz-Candia), Pls.' Ex. 376 ¶¶ 23-27, 29-32, 43-46 (arguing that the laws do have extraterritorial

-42-

effect). The Court, however, does not need to reach this question because there is no evidence in the record that PDVSA or the Venezuelan government, under either regime, actually enforced these laws against PDVH. Specifically, there is no indication that PDVH's contracts were reviewed by PDVSA or that a sign-off from PDVSA's president was ever sought or required. On the contrary, the directors and officers of PDVH testified that they did not consider PDVH bound by Venezuelan laws. Pls.' Response to Defs.' 56.1 ¶ 100.

In a parallel situation, the Second Circuit held that a 2014 Moldovan law that purportedly directed Moldovagaz, a Moldovan company in which Moldova owned a minority stake, to invest in a specific compressor station and pipeline was not sufficient to establish alter ego status of that company. Moldovagaz, 2 F. 4th at 60. This was because there was no evidence "indicating that the Ministry of Economy forced Moldovagaz to invest in these improvements or even that it could have done so." Id. And even assuming that there was such evidence, the Second Circuit concluded that "one instance of an alleged directed investment over the course of twenty years is insufficient as a matter of law to demonstrate significant and repeated control over . . . day-to-day operations." Id.

Plaintiffs also highlight the 2017 arrest of six Citgo executives who had traveled to Caracas for a board meeting and

were subsequently detained by the Maduro regime. The six executives were imprisoned for years and were eventually returned to the United States as part of a prisoner exchange by the United States. These facts are not evidence of pervasive business control of PDVH, but instead evidence of a political crisis in Venezuela. And even assuming arguendo that these facts are relevant to the question of control, they support the opposite inference — that Venezuela lacked such control. See id. at 57 n.10 ("[T]he fact that a sovereign would need to initiate a prosecution to drive a corporate executive out of the country would suggest that the sovereign did not exercise extensive control over the corporation's day-to-day activities in the first place.").

With respect to the directives issued by the National Assembly, the Court concludes that the so-called "efficiency criteria" and "accountability oversight" mechanisms constituted policy guidance consistent with PDVSA's status as the sole shareholder of PDVH and with its transitional authority over PDVH. Indeed, the Transition Statute expressly authorized President Guaidó to "appoint an ad hoc Managing Board" of PDVSA "to exercise PDVSA's rights as a shareholder of PDV Holding[.]" Jiménez v. Palacios, 250 A.3d 814, 825 (Del. Ch. 2019), as revised (Aug. 12, 2019), aff'd, 237 A.3d 68 (Del. 2020). Accordingly, the Court finds that the issuance of these policy directives does not demonstrate that the National Assembly exercised outsized influence or

operational control over PDVH. See Crystallex II, 932 F. 3d at 146-47.

As a secondary line of attack, plaintiffs again argue that PDVSA's pervasive control and political interference over PDVH's ordinary business operations is evidenced by the use of PDVH funds for legal defense costs of the PDVSA Ad Hoc Board, as well as PDVH's involvement in settlement negotiations and debt restructuring efforts in the United States. Defs.' Response to Pls.' 56.1 ¶¶ 544-47, 703-19. However, as previously discussed, the record does not support the conclusion that the litigation expenses were paid from general PDVH funds. Rather, the evidence indicates that the payments in question derived from funds due to PDVSA or PPSA for crude oil shipments, which remained unavailable due to applicable sanctions.

With respect to PDVH's role in any settlement negotiations, any such activity does not bear on control by PDVSA or the National Assembly. PDVH is either a named party to many of the disputes — such as the instant matter — or, at a minimum, its assets or equity are directly implicated, as is the case in the Crystallex litigation. And lastly, PDVH's participation is not inconsistent with PDVSA's status as the sole shareholder of PDVH, which includes, among other rights, the authority to dispose of PDVH's shares or equity interests in litigation.

> iv. *PDVSA and Venezuela allegedly issued policies or directives that caused PDVH to act directly on behalf of Venezuela*

Finally, plaintiffs contend that Venezuela has formulated policies and directives that caused PDVH to act on its behalf. In this regard, the Second Circuit explained that a mere alignment or assistance with the policies and goals of the sovereign is not enough to overcome the presumption of corporate separateness. Moldovagaz, 2 F.4th at 64 (quoting EM Ltd II, 800 F.3d at 64). As an example of such control, plaintiffs cite the February 2019 Transition Statute whereby the National Assembly ordered PDVH to halt dividend payments to PDVSA while the Maduro regime retained control of PDVSA's assets and offices. See Defs.' Response to Pls.' 56.1 ¶ 531. It is clear, however, that any such directive was without effect. Payments of dividends had been effectively barred by OFAC sanctions since 2017, and the attachment of PDVH shares by Crystallex in 2018 would have independently precluded any declared dividends from being paid to PDVSA — even if such payments had been authorized by OFAC. Pls.' Response to Defs.' 56.1 ¶¶ 65, 308. Both events had occurred well before the National Assembly enacted the legislative provisions at issue.[17] This case is, therefore, unlike McKesson Corp. v. Islamic Republic of Iran, 52 F.3d 346

---

[17] Moreover, the Court notes the internal inconsistency in plaintiffs' position: their current theory — that the PDVSA Ad Hoc Board stripped PDVH of value by preventing the payment of dividends — directly contradicts their earlier allegation that PDVSA and Venezuela improperly caused PDVH to declare excessive dividends.

-46-

(D.C. Cir. 1995) (which is not, in any case, binding on this court). In McKesson, upon recommendation by the board and with the involvement of Iran's Cabinet Ministers, the shareholders made specific decisions regarding the timing of cash and stock dividends to exclude payments to foreign shareholders. Id. at 351-52. As discussed, the policies and goals reflected in the Transition Statute do not manifest similar signs of irregular and selective pursuit of Venezuela's state policies and, importantly, unlike in McKesson, do not have a demonstrable effect on the actions of PDVH, let alone manifest extensive day-to-day control.

As a last resort, plaintiffs attempt to use PDVH's registration under the FARA and its advocacy with the United States government as evidence of PDVSA's control. See Defs.' Response to Pls.' 56.1 ¶¶ 687-702. However, under the governing DOJ interpretation of the FARA, a company must register as an agent when, as in the case of PDVH, the majority interest is owned or controlled by a government or government-controlled entity. Pls.' Response to Defs.' 56.1 ¶¶ 151-52.[18] Because of the arguably broad sweep of the statute, courts have recognized that a FARA agency relationship does not create or even bear on, in the absence of

---

[18] Under FARA, a person or entity is considered an agent if they, inter alia, act "in *any* [ ] capacity" at the "request" of "a person any of whose activities are directly or indirectly supervised . . . in whole or in major part by a foreign principal[.]" 22 U.S.C. § 611.

additional facts, a common-law agency relationship sufficient to impose liability on the company. See Att'y Gen. of U.S. v. Irish N. Aid Comm, 668 F.2d 159, 161 (2d Cir. 1982).

The undisputed facts here show that PDVH instead pursued its own interests by, inter alia, advocating that the United States maintain sanctions restrictions that protect PDVH's property and for a favorable resolution of the ongoing litigation. See Pls.' Response to Defs.' 56.1 ¶ 153-61. And to the extent that PDVH met or otherwise contacted the representatives of the U.S. government, there is no evidence showing that these contacts were made solely at the behest of PDVSA or Venezuela. These partly self-interested lobbying activities do not establish that PDVSA possesses significant control over the day-to-day operations of PDVH.

In conclusion, while the Court recognizes that none of the aforementioned factors are dispositive and that the evidence regarding each must be viewed as a whole, rather than in isolation, the fact that plaintiffs failed to satisfy any of the alter-ego factors applicable here strongly support the Court's conclusion that, on this record, plaintiffs have utterly failed to support their claim that PDVH is an alter ego of PDVSA.

D. Issue Preclusion

Plaintiffs also ask the Court to apply issue preclusion with respect to the findings of the District of Delaware and the Third Circuit, which established that PDVSA is the alter ego of

-48-

Venezuela. See Crystallex II; OIEG. However, because plaintiffs failed to carry their burden to establish that PDVH is the alter ego of PDVSA, the Court does not reach this question.

### E. Equitable Considerations

The Court further concludes that Bancec's equitable veil-piercing remedy is independently unavailable in this case for at least two reasons. As the Second Circuit has explained, Bancec provides "a unique, equitable remedy to prevent a foreign government from eluding liability for its own acts when it affirmatively seeks recovery in an American judicial proceeding." De Letelier v. Republic of Chile, 748 F.2d 790, 794 (2d Cir. 1984). The Supreme Court in Bancec itself emphasized that the doctrine was intended to prevent "the injustice that would result from permitting a foreign state to reap the benefits of our courts while avoiding the obligations of international law." 462 U.S. at 633-34; see also Rubin v. Islamic Republic of Iran, 583 U.S. 202, 211 (2018) (noting that one Bancec factor is whether adherence to corporate separateness would allow a foreign state to enjoy benefits in U.S. courts while evading its obligations).

But this is not such a case. PDVSA has not avoided its obligations while exploiting the benefits of the United States courts. On the contrary, both Venezuela and PDVSA have already been haled into U.S. courts in the long-running Crystallex litigation in the District of Delaware, of which plaintiffs have

-49-

long been aware. In Crystallex, a court-appointed Special Master has spent over four years designing and conducting a judicial sale of PDVH shares on behalf of eighteen creditors of Venezuela or PDVSA that hold judgments collectively exceeding $20 billion. These creditors are subject to a Priority Order entered by the Delaware District Court that entitles them to sale proceeds in the order of their diligence in pursuing their claims. Crystallex, Dkt. No. 646. Accordingly, there is no foreign sovereign here that is attempting to shield assets behind a sham corporate form. The sovereign assets are already available to creditors through the ongoing sale of PDVSA's assets in Delaware. If anything, plaintiffs action here hinders the orderly and equitable distribution of Venezuela's assets in Crystallex, a process in which they could have participated had they pursued their rights with diligence. The Court, therefore, concludes that the Bancec doctrine is inapplicable because there is no inequity to be cured that is not addressed in Crystallex proceedings.

Equitable veil-piercing is inappropriate for the related reason that "it is fundamental that equity will not grant relief if the complaining party has, or by exercising proper diligence would have had, an adequate remedy at law." Campaniello Imports, Ltd. v. Saporiti Italia S.p.A., 117 F.3d 655, 662 (2d Cir. 1997). Here, plaintiffs knowingly chose not to pursue a remedy at law, the attachment of PDVH shares, in the Crystallex litigation, and

they did so without a justification. Plaintiffs acquired the Notes
at issue in 2018 and 2021, by which time the Notes were already in
default, and the Delaware District Court had already attached
PDVH's shares. Pls.' Response to Defs.' 56.1 ¶¶ 192-93, 230-32,
272-76, 342-52. Despite having ample notice and opportunity,
plaintiffs waited until August 2023 — that is, several years after
acquiring the Notes — to attempt participation in the Delaware
sale process, and even then, they did so without securing a
judgment confirming PDVSA's liability on the Notes. Crystallex
Dkt. 1102; Pls.' Response to Defs.' 56.1 ¶¶ 355-68. It was only
after plaintiffs were denied participation in the Crystallex
process on account of own delay that they, after having waited for
nearly three years in the case of Girard Street, and over five
years in the case of G&A, brought the consolidated cases here
against PDVSA and later PDVH as well. Dkt. 1, Girard St. Inv.
Holdings LLC v. Petróleos de Venezuela, S.A., No. 1:23-cv-10772-
JSR (S.D.N.Y. Dec. 11, 2023); Dkt. 1, G&A Strategic Invs. I LLC v.
Petróleos de Venezuela, S.A., No. 1:23-cv-10766-JSR (S.D.N.Y. Dec.
11, 2023). It would, therefore, be fundamentally inequitable to
allow plaintiffs to cut ahead of creditors who have acted with
diligence and have participated in good faith in the court-
supervised process in Delaware. Equity does not reward sleeping on
one's rights, nor does it allow parties to engage in strategic

forum shopping. The equitable veil-piercing remedy under <u>Bancec</u> is unavailable under these circumstances.

Accordingly, for all the foregoing reasons, the Court hereby: (1) grants summary judgment in favor of plaintiffs on Counts I and II, confirming PDVSA's and PPSA's liability on the Notes; (b) grants summary judgment in favor of defendants PDVH and PDVSA on Counts III and IV, dismissing those counts; and (c) denies plaintiffs' summary judgment motion on Counts III and IV. The Clerk is directed to enter final judgment and close this case.

Dated:     New York, NY
           June 25, 2025                    JED S. RAKOFF, U.S.D.J.